Good morning, Your Honors. May it please the Court. My name is Ryan Baker and I represent the defendants, appellants, slash appellees in these consolidated appeals and cross-appeals. Congress and the courts have always protected an individual's right to privately perform copyrighted works. The District Court's ruling in this case threatens that right. Accordingly, the rulings of the District Court in these cases should be reversed. The District Court's plaintiffs, the networks, had established a likelihood of success on the merits of their copyright infringement claims. And on that basis, the District Court found that the other three factors in the preliminary injunction analysis also weighed in favor of an injunction. The networks cannot establish a likelihood of success on the merits because the only type of performance that is enabled by FilmOn X is private. Section 106 of the Copyright Rights Act defines the exclusive rights of the copyright holder that are at issue here. And it reads, in relevant part, the owner of the copyright under this title has the exclusive rights to do and authorize any of the following in the case of motion pictures and other audiovisual works to perform the copyrighted work publicly. There is no exclusive right of the copyright holder to regulate private performance. That regulation is performed under the court's holdings, such as in the Dish case, under a fair use analysis. The copyright holder cannot dictate private performance. Section 101 of the Copyright Act defines what it means to perform the work publicly. And this is the transmit clause that is central in this case. And again, in relevant part, that clause reads, to perform or display a work publicly means to transmit or otherwise communicate a performance or display of the work to the public by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times. That language contemplates both private and public transmissions. Otherwise, the phrase to the public would be superfluous and it could be removed from the statute. Congress left that in there because that is critical to the transmit clause. Again, it is only transmissions to the public. When the networks transmit their copyrighted programming to the public, anyone can receive it with an antenna. Compare that to public. Counsel, when Congress had made the 1976 change, they were doing it in response to the developments in cable television, were they not? That's correct, Your Honor. And they also addressed a couple of community antenna cases that were cited in the district court, in this case Fort Knightly and Teleprompter. And those cases are decidedly different than the case at issue here. The technology is different. In those cases, again, there was a community transmission. There was an antenna on top of a hill that provided one source signal to thousands or tens of thousands or more recipients. In this case, the technology Phil Monette employs allows a user to access a discreet, unique antenna and a discreet, unique DVR and control that antenna and privately transmit the signal the networks have previously publicly broadcast to himself. So there are two transmissions. All right, but your system is pretty darn clever, isn't it? Essentially, you're doing the same thing. You just have engaged in the mechanical setup of having a dedicated antenna for each user as opposed to one antenna for all users. That's the whole distinction that this case rises or falls on, right? I would agree with Your Honor that the technology is clever. I disagree to the extent there's a further characterization which the networks would urge and which the dissents in the Second that it's some sort of Rube Goldberg-like contrivance. In fact, it's innovation. And it's very, it's exactly the same as if a customer or an individual were to go to a Best Buy or any other electronic store, buy an antenna and a DVR and put it on his or her home or put it somewhere else. They could put the antenna on top of a hill and run one cable to their own DVR device and watch that in their home. That's a private transmission. And that's exactly what these do. Instead of, although Your Honor, let me just finish the example. Instead of going to the Best Buy and paying $1,000 for a television and $100 for an antenna and $200 for a DVR, they have the option to pay a lot less for a month. And instead of having the antenna and the DVR in their home, it's in a warehouse somewhere within the area in which they're able to receive the free-to-air broadcast transmissions. Again, it has to be, it can't be overemphasized that all of the transmissions at issue here are free-to-air. Everybody that's receiving a private transmission from Film On X could otherwise receive it freely by putting an antenna, again, on their house or they could put it on their neighbor's house and run a cable. But isn't your problem that while you describe it as an innovation, it's an innovation that was arrived at for the sole purpose of avoiding the statute? Is there any other purpose to it other than not falling within the statute? Anything economically, financially, technologically improving or anything like that? Or is it just we want to make sure we're not within the statute? And maybe you've succeeded, but the purpose of the innovation is to get out of the statute, right? Well, Your Honor, I certainly agree that the purpose of the innovation is to comply with the law and so as to not violate the statute. That is absolutely correct. And furthermore, to comply with the law of another circuit in the United States, a second circuit that has interpreted more specifically some of this technology. And that's, of course, not dispositive in this Court. It's disruptive and it's certainly a relevant precedent. And in those cases, the technology, again, initially in cable vision called the RSDVR that enabled an individual to control a DVR which was remotely located and then privately transmit, maybe there was time shifting, and privately transmit that signal to him or herself. And I would argue to the Court that to the extent there is an attempt to construct a system that may be designed to specifically comply with the transmit clause and not violate it, that that's the basis of innovation. And I think that's why in this case you have so many organizations that are not affiliated with Film on X in any way, that are for consumers' rights, that are for industry and innovation, have filed amicus briefs in support of our issue. And it's not only important as applied to Film on X or ARIOS technology, but it's important with regard to cloud computing. Indeed, the position the networks take would not only eviscerate the right of private performance vis-a-vis Film on X, but anybody who's computing in the cloud, take iTunes for an example, who has a license to, an individual has a license, can go on and buy a song. If two, three, or five hundred people buy that song and then transmit it to themselves under the network's interpretation, which conflates performance and work, all those transmissions have to be aggregated. Well, correct me if I'm wrong, but doesn't iTunes pay a royalty to the producer for each one of those uses, which you do not? iTunes pays a royalty to have the right to sell the work. And the reason that I think it's an appropriate example is because in this case, again, the individual has the right to freely obtain the network signal. They can't freely obtain the work. They can't freely somebody recorded something from the television on their own DVR and then put it in the cloud themselves and then transmit it to themselves somewhere else in the world and somebody else had done the same thing. Again, there's no distinction and there's no case anywhere. There's none cited by the networks. There's none anybody can cite in which a technology exactly like the technology at issue in this case, Film on X, which provides discrete, unique transmissions to private Well, the only other case that's on all fours is Aereo. Because it's a new technology, right? That's right. So that doesn't help us very much. Well, cable vision's been around for some time. And I think, as your honors know, there have been numerous attempts by the networks to get the courts to reconsider those rulings. And those requests have been rebuffed because they are Well, I'm wondering, you mentioned that there's an effort to get the courts to reconsider, but in the end, isn't this really a problem for Congress? In other words, so long as we can determine that your client has come within the terms of the existing Copyright Act, that's enough. In order to change the policy here, is this a matter that really is a judicial issue, or is this more a matter to be left to the Congress? Well, I would agree with your honor that it is ultimately a matter to be dealt with by Congress because the technology at issue in the Aereo and the Film on X cases is lawful under the Act because it complies with the literal terms of the statute, which requires as a preliminary matter, before you get to different times, different places, it has to be a transmission to the public that constitutes the performance. And the district court sites on command, the network site cases like Red Horn, and they site WTV, in all those cases, you had a common source. There was one source that was being transmitted again and again and again. Again, here, only the user can view the specific Film on X user who has elected by his or her own volition to tune the antenna to a particular transmission, record that transmission, and then view it. Only he or she can privately view that transmission, so it's private. Let me ask you another question. What role does the free broadcast of the signal, that is the broadcast through the airwaves, play in the legitimacy of your system? That is, if indeed that signal was only available on cable or satellite, would you be able to do what you're doing? No, Your Honor, because the fundamental underlying issue, we may or may not be able to do what Film on X is doing, I guess is the more correct answer. The fundamental issue is whether or not there's a right of the individual to view the performance. And it can't be disputed that in this case, and it's going back to the iTunes example, we talked about a royalty, there has to be some right that the user has to acquire a song. Here, every individual has the right to access free-to-air television. In fact, Congress in the 76 Act was very clear and addressed teleprompter in Fort Knightley to make sure that there was a compulsory license scheme in place so that the people who didn't have access, once these net community antennas were removed, would continue to have access. And that also goes to the public interest prong, which is important in the Court's analysis here. And I'd like to actually reserve the balance of my time to respond and also to respond to the cross-appeal, unless the Court has additional questions. Thank you. Good morning, Your Honors. I'm Paul Smith, representing the Fox apologies. I'm going to divide my time with Mr. Garrett, who represents the remaining apologies with the Court's indulgence. In our view, Your Honors, this case ought to be a simple one. Judge Wu was clearly right to grant a preliminary injunction here. What Congress did in 1976 was say that a service that retransmits broadcast television programming to viewers is publicly performing that show and has to have a license to do so. Film on X is a business that takes broadcast programs off the air and sends them to, retransmits them to viewers, members of the public, who go to the company website, and they want to talk about, like, they're operating a DER. What do you do at the company website? You click on Channel 4, and you watch Channel 4, essentially live. Some subscribers can watch it time-delayed, et cetera, but basically it's a live retransmission service that just takes TV off the air and sends it to people to watch whatever channel they want to watch. In that sense, it functions indistinguishably from a licensed table or satellite retransmission service, but it claims it's exempt from the rule barring unlicensed retransmissions simply because of the way it's designed its hardware, which is to say it uses these mini-antennas, and it pauses for six seconds to make a copy of the screen before then doing the transmission. And that way they can say, well, we're like a DER because there's a six-second copy. The user, of course, is not exempt. Counsel, to what extent are we to consider the licensing aspect as we look at it from the standpoint of the Copyright Act? Aren't those two separate issues? Your Honor, I'm not sure I understand the question. What we're asking here is to enforce our right to have no unlicensed retransmission, to have a business built on using our copyrighted content. And my question is, to what extent is whether or not there's a license relevant to interpreting Section 106? The, the, the, I think the question goes the other way around. You have to, you have a right of, exclusive right to control who publicly performs your shows. And unless they have a license, they can't do that. And so the statutory license isn't relevant, if that's what you're asking. The question, I think it's conceded here that they don't have a license and, and, and that they're, they're saying that they can operate without paying us any royalty. They don't have a license for copyright law purposes. Right, exactly. All right, all right. You're not talking about the FCC kind of license? Nothing to do with that kind of license at all, Your Honor. All right, very well. Now, now we understand each other. Can I ask you this question? Let's suppose, for whatever reason, it's not a real world example, they did not have a thousand or ten thousand separate antennas. They only had one. And it was only beamed to the president of their corporation, maybe because he's testing it out. Is that a violation? If they're not offering it to the public, and they're simply setting up a single line from one antenna to one television, the distance by itself doesn't make it public performance. Okay, so then you've got, let's expand it and say we have five antennas, and they all go to executives of the appellant's company. Well, under the, under the, the definition of public performance, the question ultimately is, is it to the public? And at some point, if it's a private group meeting in a conference room, you might say that's not the public yet. But this business is open to anyone. Anyone can buy an antenna, effectively, that is, lease an antenna from them. And therefore, that's what makes it public. Your Honor, it's not leasing an antenna. It is clicking on a website, and they send you the show. You're not even aware the antenna exists. But it does exist. That's not disputed. They have these dime-sized antennas. Right. That's the change in technology. One thing that they, that plus the copy, which is actually what's considered more important in the Second Circuit is the, is the infinite, small amount of copying that occurs here because of the way the cable vision case is written. Could you go back to Judge Kogan's question? So, so your position is that the, the transmit clause is not violated if it goes to one guy? And then, and the next question is five guys, right? And your point is, you, we interrupted you. I think I interrupted you. That at some point, it becomes a transmission to the public. Right. The question ultimately is, is it going just to a, a, a, a, a, a, a, a, a, a, a, a, a, a, a, a, a, a, a, b, a, b, a, b, a, b, a, b, b, a, b, a, b, b, b, b, b, b, b, b, b, b, b, b, b. There is a substantial number of people outside of a normal circle of family and social acquaintances or perhaps business acquaintances. This is a business serving the public. All you have to do is go to the website. I encourage you to do this, FilmOn.com, click on Channel 4 and there it is. And so, and the Should the commercial nature of the relationship matter? The fact that they're paying a fee and have a commercial relationship? Your Honor, that's, the policy of the statute is that people should not be able to build businesses on the backs of other people's content. I don't think that's an element of the test. The test is whether you're, you're directing transmissions to the public of somebody else's copyrighted broadcast programming. And what, what's very clear about the statute is it doesn't matter how you do it. It says any device or process existing now in 1976 or later developed, they tried to make it as technology neutral as they possibly could, because they knew people would try to find ways to design around this requirement that they get a license to make money off other people's content. The on-command case talked about the commercial nature, though, didn't it, of the relationship between the receiver and the transmitter? It did, Your Honor. And Judge Chin did in his... I, you know, I think that that could be a reasonable background principle, but ultimately I don't think you're going to want to have a rule that says a non-profit good guy, rich guy who decides to do this for nothing, to give it away, ought to be able to do this. It's still a... You don't like Judge Chin's dissent? Almost nothing about Judge Chin's dissent that I don't love, but I'm not sure that that is the... I didn't expect you to talk me out of it. The other thing that's important, we heard a lot this morning about discrete, unique transmissions, as if somehow that makes a difference. But the statute is quite explicit that that doesn't make a difference. It says it is a public performance, even if transmissions are going to different people in different places at different times. In other words, the statute quite expressly contemplates an amalgamation of numerous discrete point-to-point transmissions and says that combination of them is a public performance. This, with respect to the Second Circuit, is where they went, seemed to be completely off the rails. It's first in Cablevision and then applying that in Aereo. The Second Circuit derived from that part of the sentence the principle that you look at each individual transmission to decide how many people can see that one transmission. But in a world of point-to-point transmissions, which is how the Internet works, there's always going to be one computer at the other end of the line. And Congress said, we don't care. Even if you're sending transmissions here, there, and around, you are publicly performing if you're willing to send them to the public. And so it seems to me that what this Court needs to do very clearly is say, we read the statute. It was applying Cablevision. And Cablevision just went off the rails. But this Court needs to go back and say, functionally, are they doing what Congress said in 1976 you can't do, which is build a service that takes copyrighted programming without permission and sends it to the public to be watched some other place at a distance, because that is exactly what they do. Now, one of the things I would... So can I ask you about Cablevision? Yes, sir. Obviously you disagree with the Second Circuit's analysis, but to the extent that we look at that case from a factual standpoint, what are the significant differences, if any, between the facts in this case and the facts in Cablevision? Well, they're very significant. What they ultimately tried to be legally significant is a question that some later case may decide. But there are huge differences. That was a case where a cable company had a license under the statute to transmit all the programs to its customers. And it then decided as an adjunct to that license service to provide the functionality of a DVR, or what we used to call a VCR, on its computer. So the person could save something and then play it back. And here, on the other hand, what you're talking about is an entirely unlicensed business that has no relationship under any license to do... and no right to have any use of anybody's copyrighted programming. It sends it live as well as record it. If you get a subscription, you can record it. And so it is very different. And Judge Chin certainly thinks that that ought to be the decisive difference between the two cases. He thinks that the original DVR case might very well be rightly decided, but clearly Aereo can't be. So Cablevision was a licensed exploitation case, whereas this is a totally unlicensed case. That's your distinction? It is a distinction. There was a license to send the original stream through to people to watch it on their cable. It's a cable company. And then they added this other function. Whether or not ultimately that is enough to make a legal distinction, I'm not sure. Cablevision itself filed a brief in this court saying, we're right. ThelonX should lose, but RSDVR should win. So they think that there's a way to draw that distinction. I think one of the things that I would like to leave you with today is they like to talk about every other fact situation they can, except what these guys are doing. So we're hearing about cloud computing, and we're not sure what that means. It means a lot of different things. We're hearing about DVRs. But what these guys do is they're a live retransmission business, exactly like a cable company. They do the same thing, and they're making money off of it. And they like to say, well, no, we're not doing that. A cable company is you click a button, and the show shows up. On their website, you click a button, and the show shows up. But they want you to say, no, the person is playing it to themselves on their computer, and we're just, it's all private performance. But the same argument could be made by a cable company. We're not doing it. The subscriber is doing it when they tell their cable box to watch Channel 4. That argument can't wash, because the statute says, no, we want to make these cable companies pay these license fees. And the same thing ought to be true in the Internet age, now that there's another way of doing the exact same function. I see I've just passed the ten-minute mark, Your Honor. Maybe I should let Mr. Garrett have the... He probably thinks so. Thank you. It's always dangerous to go second when you're splitting your time. You have to trust the first person. Good morning, Your Honors. I'm Robert Garrett. I represent the NBCUniversal plaintiffs in this case. May it please the Court, let me go back for a moment to the language of what is the proper interpretation of that language. And the transmit clause says that it is a public performance to transmit a performance of a work to the public by means of any device or process. Judge Ginn correctly found that that is exactly what Aerial Killer does. It That is exactly what cable operators do and why Congress determined that they were subject to liability in the 1976 Copyright Act. They take the same 9 p.m. Sunday evening broadcast by WCBS of the Good Life and they transmit it to multiple individuals, whether it's a 9 p.m. broadcast available to multiple households, to thousands or potentially millions of households. And that is what brings them within the transmit clause, as Judge Wu correctly found. Judge Kogan, you raised the issue about whether this case should be different because we're available to residents of any particular service area. And that's exactly the issue that Congress dealt with in the 1976 Copyright Act. It was a very difficult issue. In fact, they debated this issue for more than a decade because of the fact that these are broadcast signals that are freely available to the public. But what Congress ultimately determined, the to profit off the delivery of that copyrighted programming to subscribers. In those circumstances, licenses should be obtained and compensation should be paid to those copyright owners whose works are the focal point of the business being built. Counsel, I hear your argument with respect to the policy of the Copyright Act, but we are dealing with a specific section, and I don't think you've been responsive to Mr. Baker's arguments that this is a new and a different technology which complies with the Act. Can you help us on that? Why can't we entertain the suggestion that this is a different technology which is not subject to the same rule? Fair enough, Your Honor. When Congress reached that policy judgment in the 1976 Copyright Act, it had specifically before it a model of community antenna television and cable systems. In the four decades since that decision was made by Congress to subject those types of retransmission services to liability, there have been a number of different types of retransmission services that have emerged with all sorts of different technologies that made them very different than cable systems, made them very different than community antenna. One example is satellite. Another example are telephone companies offering retransmission services using IPTV technology. In all cases, those services, because they share the critical common factor of retransmitting broadcast signals, have still been required to get licenses. And let me point out specifically what happened. Well, except for Aereo in the Second Circuit following cable vision. Yes, Your Honor, and we believe that decision is wrong. Well. That is wrong. All right. Well, let me give you as an example, Your Honor, satellite carriers. They came along several years after cable systems had a very different type of technology. And what happened is that not that they got a free pass, they had to go back to Congress and ask Congress for a compulsory license in order to retransmit this program in the same way that cable systems do. Congress ultimately gave them a compulsory license, which is embodied in Sections 119 and 122 of the Copyright Act. And you'll see those are very complex, very detailed provisions that attempt to balance a whole variety of different factors and considerations that are specifically relevant to satellite carriers. If Internet services want a compulsory license, they want to be able to do this without actually negotiating licenses, then that is the route that they should take so that Congress has the opportunity to balance those types of different factors and policy considerations. The basic determination, the basic determination that Congress made in the 1976 Copyright Act is that the retransmission of broadcast signals is an activity that should fall within the copyright owners, should be entitled to compensation for that. Judge Colgan, again, going back to the broadcast signal question that you asked here, we have on the specific facts before us where Aerokiller retransmits Los Angeles stations to Los Angeles residents. But their legal theory does not stop at that. Under their theory, they can take Los Angeles stations and they can send them all over the country. They could take a home box office or they could take ESPN and do that and not say that it's a private performance. They simply furnish individual mini-satellite dishes here. They make an important point about the fact that they are simply allowing consumers to do what they could otherwise do. Well, of course, that is exactly the argument that during those debates, cable operators came in and community intent operators came in and said, we're just giving, we're just simply supplying equipment. We're simply allowing the consumers to do what they'd otherwise do for themselves. And Congress understood that those were difficult arguments that had to be addressed. But ultimately, what it concluded was that the focus should be on the fact that you have a commercial operation that is attempting to build its business upon the exploitation of copyright owners programming it. I want to emphasize that the legal theory that they have here is that as long as they are making these one-on-one transmissions, it doesn't make any difference whether what they're taking is the Los Angeles signal and delivering it in Los Angeles or the Los Angeles signal and sending it around the country or even home box office. Their theory simply focuses upon those individual transmissions and not what the consumers can or cannot do. Counsel, is your theory that there is no room for private transmissions under 101.2? No, Your Honor. There clearly is a room for private transmissions, and Judge Rue recognized that. He gave examples of someone transmitting a program, a broadcast signal, throughout the house or maybe via some distance using other technology that's on the market here. There is no question that if one person simply transmits that program to only one other person, that that is a private transmission. But that's not what is happening here. What's happening here is you have Aerokiller that is transmitting through many separate individual transmissions the same broadcast of a program to multiple individuals. And that's what the Act focuses on. That's what the Transmit Clause focuses on. The question is, is there a transmission of a performance of a work? And under the copyright law, a broadcast of a television program at a particular time is a performance of a work. And because it is that broadcast, it is that performance that is reaching a multitude of individuals, a multitude of subscribers, that we have a public performance. Let me also just briefly mention here the question of licensing came up here. And the fact that there was a licensed service in cable vision, that is very important. Because in cable vision with the RSDVR, because there were licenses, because there were commercial relationships between the parties and negotiations that went on, you know, ultimately those issues could be resolved through those negotiations. If we didn't like the RSDVR, next time the contract came up, that is something that one could negotiate over. You don't have that with Aerokiller. With Aerokiller, you have a service that says it stands outside all licensing arrangements here. There is no opportunity to go back and reach a negotiated conclusion different than what the court would reach here. Licensing is also important because my clients are very actively involved in developing the same kind of marketplace, the same Internet marketplace, trying to make this programming available to Internet enabled devices in a variety of different ways here. You have services that Disney and ABC offer called the watch services. You have different types of what they call generally teen everywhere, where different copyright owners are allowing consumers to get this programming on their mobile phones and mobile devices. This is a marketplace. You also have the Netflix. You also have iTunes. These are all licensed marketplaces that are placed in jeopardy here by saying that what this is going on here is simply a private performance. You have our arrangements with the various cable operators with satellite carriers. Those are licensed arrangements here. And that's what's at stake in this case here for us. We're simply asking that you allow the marketplace to function here and have the parties negotiate these licenses and not simply say that what Judge Chin correctly recognizes as a Rube Goldberg type contraption are a sham. These are not private performances. Singing in the shower is a private performance. Sending 50,000 people the same program, the same program at the same time is not singing in the shower. Thank you very much, Your Honor. Thank you. Thank you, Counsel. You've reserved time, Counsel. Thank you, Your Honors. CableVision is not off the rails any more than the Transit Clause is off the rails. And Aereo obviously applied the facts of a case analogous to the facts in this case. Followed CableVision and found that the transmissions that are created by a FilmOnX user using FilmOnX technology are private transmissions. Nobody's arguing that FilmOnX is a cable company. So to the extent Counsel is making the argument that there's a requirement for a license, that's simply not true. Nor is Counsel's characterization of the FilmOnX argument that FilmOnX may transmit Los Angeles programming in New York or anywhere else, anything that's ever been argued in this case. In fact, it's exactly the opposite. And that is because FilmOnX enables users, individuals to do what they are otherwise lawfully entitled to do, and that is watch the network programming that Congress has taken steps to ensure they're able to watch. The fact that FilmOnX charges a fee to some of its subscribers, those who want to watch the service in high definition, is totally irrelevant under the Transmit Clause. In fact, the word for commerce or for a fee is nowhere in the clause. In fact, it says to the public. And again, this concept of aggregation, that we have to create an amalgamation or aggregation of all of the individual's transmissions through a technology that's provided by FilmOnX, finds no basis in case law or in the statute. To take the example that I was referring to earlier, an individual going to Best Buy, if you have 10,000 individuals who buy a Sony antenna and a Sony DVR and a Sony television, does Sony have to pay license fees or is it liable for copyright infringement because all those people might be watching the same thing? Further, counsel tries to gloss over the fact that there is a DVR copy made each time an individual wants to watch a program. There is time shifting. Whether it's one second or six seconds or two hours, fair use, as is recently, again, enunciated in the DISH case, allows a user to do that privately and to transmit that performance to his or herself privately. A comparison of the facts further with regard to the volition, because it seems again that the counsel for the networks argues that FilmOnX is the one making all of these transmissions. Well, in fact, it's the users. FilmOnX doesn't transmit anything unless a user logs on, controls the antenna, and then directs that antenna to record into the DVR and then transmit to them over the cables. And as counsel has admitted, it doesn't matter if the cord is 10 feet long or 10 miles long. That's irrelevant. Can I just walk you back to the statutory definition for a minute because I don't want to lose the train in the complexities. What we're really talking about is the definition of to the public in the transmit clause. And we know that to the public includes receipt of the performance at different times and at different places. And I understand your point is this is one antenna per person. But let me give you two hypotheticals and ask you if they come out different. One is the antenna goes to a house full of people, friends. All right? So it's kind of public, it seems to me. And the other is it goes to a bar which charges admission for everybody to come in and watch your signal from that one antenna to the bar. Are you still okay in that even though the ultimate recipients of your retransmitted signal may not be? When I say are you okay, I mean are you violating the statute at that point because you're sending something to, in my extreme example, a commercial establishment which is then selling it to the public? The liability in that case, first of all, would be on the part of the bar owner or the individual who is transmitting it or showing it, displaying it to the public under Section 1. The transmit clause, Your Honor, under that scenario, if I think it gets into more factual inquiry which would consist of if Philmon X were aware that its signal, that it was facilitating the transmission of from a user, were being publicized or broadcast to the public in that way, there could be secondary liability. But those are different facts that are before the court in this case. So I would submit that there would be a factual inquiry about those particular facts and it could be But that's going to happen if your system succeeds, right? It happens now, piracy of signals in that fashion by a bar sending the signal to all of its patrons and charging $10 a head even though it's only paying for one subscription. That's absolutely right, Your Honor. In fact, I litigate a number of those cases for commercial misuse. There's no question. But your client, Philmon X, knows that's going to happen even with that one antenna to a dedicated user because some number of them are going to be commercial establishments. Philmon X requires every user to accept his terms of service which provide that they will not do that. And in that way further, Your Honor, Philmon X is not unlike any other service in the cloud or service that operates over the Internet because anybody can take a piece of copyrighted work to which they have the fair use right to privately perform and abuse that right and exceed the parameters of what they're otherwise able to do under the doctrines of fair use. Again. As I stated earlier, the court's primary error was to find that the networks had a likelihood of success on the merits. In doing that, the court ignored cable vision, ignored the reasoning of the district court in Aereo. And since, of course, the district court's ruling here, the Second Circuit has applied cable vision to facts totally analogous to these in the Aereo case. Their response is that the Second Circuit's off the rails. I should follow that rationale. The basis for the district court to conclude that there was irreparable harm on the networks was that Philmon X was allowing copyright infringement. Because there's no infringement, there's no irreparable harm. The balance of hardships also tips in favor of Philmon X. There's evidence in the record of the harm and the hardship that Philmon X would continue to suffer as a result of this injunction. The public interest is clearly in favor of Philmon X and innovation that complies with the law in cloud computing. It also enables people who are now known as cord cutters who don't have the technology that most of us have had for our lives to watch television. They watch it without a cord on mobile devices and things like that. Philmon X allows those types of people to receive free-to-air broadcast signals. And lastly, counsel didn't mention anything about the geographic scope, but I'd like to The district court did not abuse its discretion under 17 U.S.C. section 502A, which dates any court having jurisdiction of a civil action arising under this title may subject to provisions of section 1498, grant temporary and final injunctions on such terms as it may deem reasonable. In light of the ruling that has already been issued by the second circuit, and again, specifically the ruling in area which was issued after the district court ruled in this case, it would be, would violate comedy for this court to seek to impose a nationwide injunction. But more fundamentally, applying the plain language of the transmit clause, just looking at the statutory history, they've admitted there can be a private transmission. There can. That's all Philmon X enables. The network's interpretation would eviscerate the private performance right. I urge the court to reverse the district court. And with that I'll submit unless the court has further questions. No further questions. Nothing further. Thank you.
judges: Cogan, O'scannlain, Christen